Good morning, Your Honor. May it please the Court, my name is Bob Abrams. I'm here on behalf of the Plaintiff Appellants. Summary judgment was granted in this case solely on the District Court's conclusion of no injury in fact. And we submit that was error. The payment of higher than competitive prices and the elimination of competition, and particularly the elimination of Walmart in a three-firm DVD antitrust rental market constitutes injury in fact. There are three categories of evidence from which this Court can discern the injury in fact. I'd like to speak to those three categories of evidence and then go to the lower court, lower court excluded. The first category of evidence that shows injury in fact are those documents and testimony that show Walmart did compete and would have competed vigorously in the DVD rental market, and DVD prices would have been lower but for defendant's agreement for Walmart to exit the market. Now the District Court recognized that the quote, wealth of plaintiff's evidence, end quote, but then agreed with Netflix that there is no dispute that one, Walmart did not impact Netflix's pricing decisions. In other words, Walmart was a competitive non-entity. And two, that Netflix would not have lowered its prices in the face of competition from Walmart. We submit, and I would like to review, some of the record that shows that there's a genuine issue of material fact on those points, and there certainly is injury in fact that should have gone to the jury. First, on the eve of Walmart getting into the market in 2003, Netflix was thinking of increasing its price. Well, it didn't increase its price because, quote, price increase, don't want to risk it while Walmart's still lurking, record 704. Well, Walmart did enter. And Mr. Hastings, the Chairman Chief Executive Officer of Netflix, said Walmart's entry was, quote, unsettling, and, quote, anyone not scared of that is foolish, end quote, 686-87. They could at any time sell or substantiate and boost the amount of awareness and marketing of their rental program, 727. Walmart has, these are all quotes, Walmart has enough money to send a man to the moon, 696. And Mr. Hastings circulated a report internally that ranked Walmart's lower price service ahead of Netflix as, quote, most appealing to consumers, 709-711. Well, in mid-2004, Blockbuster enters this market. And it has a price lower than Netflix, just like Walmart did. And this was the beginning of a price war. With two lower-priced competitors, Walmart and Blockbuster, Netflix, October 14th, decides to cut its price. And it does. And the very next day, October 15, Mr. Hastings on CNBC says that the DVD rental market is heating up a lot faster than expected. And, quote, so it's Netflix up against Walmart, Amazon, which was considering entering but hadn't entered, Netflix up against Walmart, Amazon, Blockbuster. And that gives anybody smart reason to worry. And it's why we're doing the price cut. That's contrary to Walmart not being a viable competitor. Well, also on October 15, Blockbuster cuts its price again. And Netflix executives say the war is on. What is the very first thing Netflix does when the war is on? The 15th was a Friday. Mr. Hastings on that Sunday contacts the president of his competitor at walmart.com, a man he didn't know, but he reached out to his competitor as the first move in this war. And by the way, the war is 1107 in the record. Well, Walmart cut its price again on November 1. And on November 3, Netflix says price cut shows that Walmart is in the market for the long haul, record 714. December 22, Blockbuster cuts its price. Walmart does it again in January of 2005 with respect to the two out as opposed to the three out disc. And Mr. Fleming says that the DVD, and he's the president again of walmart.com, he says the business is booming, online business of Walmart is booming, and is among the very good businesses that Walmart was, quote, focused on developing over the next year or two. Well, it's January 2005. In Netflix, they're debating what should we do. They're in this price war. Well, Mr. Hastings sends around to his chief management group a notice that Walmart lowered its price to 1297. Why would you do that? And that's at 982 of the record. And why would you do that if it didn't matter, if Walmart was a nonentity? Well, they make a decision or projection on the 18th of January that Netflix is going to have to make another price cut by mid-March. It was, quote, more likely than not, end quote, at 988, that they will have to make that price cut. Well, in the face of that, what does Mr. Hastings do? He reaches out to Walmart again. He contacts Mr. Fleming again. Record 1010. We've asked this question repeatedly to no answer. If Walmart was so inconsequential as a competitor, why would the most senior executive, chief executive at Netflix spend his time trying to get Walmart to exit the market? And we direct the court to 943, 952, 957, 969, 1010, and 1025, all to that effect. Well, I mentioned that he contacted them first October 17th. He arranged a dinner. They had that dinner. There were, I took both those depositions. There were memory gaps. There were no notes taken. But what is clear is there is no evidence in this record that Walmart was planning to exit the market prior to that meeting. Well, when he reached out again in January, as I just said, a dinner was set up for February 9th. That dinner was held. Mr. Hastings comes with a big mailer that says buyDVDsAtWalmart.com, 1014 of the record. Right after the meeting, Mr. Hastings comes with a big mailer that says buyDVDsAtWalmart.com, 1014 of the record. Right after the meeting, Mr. Fleming confirms, quote, he wants an alliance, end quote. Record 1025. And Netflix makes clear that Walmart would have to exit the rental market for a deal to make sense. Record 961, 1025, 1034, 1042, 1128, 1130, 1139, and 1167. As this court said in Hasbrook v. Texaco, if there's even an inference of causation from the evidence, the conclusion of what that evidence shows is for the jury. Well, there's certainly, we submit, more than an inference, and it should have been for the jury. Well, the two facts that seem to concern the district court in terms of antitrust injury were, one, that Walmart at the relevant time only had 1.7 percent of the market, and, two, that in face of a blockbuster cut that Netflix decided not to lower prices. So how do you respond to those concerns? The percentage, I believe, was 1.5 percent, and the claim was, excuse me, it was too tiny to have an impact, as Your Honor said. Yes. Well, the premise is contrary to the record, because Walmart, as I just went through, as part of a three-firm market, did impact Netflix prices. The up against Walmart the quote that I just gave you, that was against Walmart by Mr. Hastings' own words. And that's why we're doing the price cut, he said. Furthermore, in January I don't think there's any question that, at least in this record, that Netflix was very concerned about the entry of Walmart into the market. I don't think that's really disputed. I think the question is, at the time, at the relevant period, was there antitrust injury? And that's the period that the district court was focused on. And I'm not taking a position one way or another. I'm just giving you a chance to respond to that. No, no. I understand. But this was well after Walmart entered. This was over a year after Walmart entered. It's 2004 that I was just referring to. And in January of 2005, when I was in a three-firm market with Blockbuster and Walmart. And there's great significance, economic significance, that was recognized by all of the experts and by Mr. Hastings in a market being a three-firm market versus a two-firm market. Before I mention the experts, I want to read you what Mr. Hastings said about that. April 21, 2005. This was in an interview. Quote, in terms of profitability over the coming years, the key issue is the number of major competitors. If there are only two major competitors, Blockbuster and Netflix, the profitability may be substantial, like the other two-firm entertainment markets. If, on the other hand, Amazon, Walmart, Blockbuster, and Netflix are all major competitors in online rental, then the profits would likely be small. So the significance is not just how do you react to Walmart. It's how do you react to Walmart in a three-firm DVD antitrust market. Well, wouldn't that depend partly on whether Walmart was a major competitor or simply a minor competitor? Yes, sir. That is an issue in this case. There are four experts in this case, two on their side, two on our side. All four experts agree that elimination of a, quote, significant competitor would be anti-competitive. There's a disagreement on whether Walmart was a significant competitor. Our experts, Gunlack and Beyer, said it was. Their experts said it wasn't. They acknowledged that if it was significant, it was important to this case. Well, that was an issue for the jury. Now, you may be saying, well, but the district court dealt with that by commenting on Beyer's opinion. What, in fact … Well, doesn't an opinion overcome the figures? I'm sorry? I said, does an opinion overcome figures? Can't the district court say, well, that opinion, that 1.5 is a major competitor, is entitled to the opinion, but the facts are 1.5 is not a major competitor. Now, the … well, the question you're raising, Your Honor, was addressed in terms of whether it was 1.5 percent or something more. If you eliminate a company, one of the three companies from a three-firm market, that can be … that is significant if the company you eliminate is a significant competitor. The … our experts found Walmart to be a significant competitor for a number of reasons. One was the money it had to develop the market. That it could have been a … Yes, sir. It could have been a significant … Yes, sir. … if it had wanted to … Correct. … invest the necessary funds. And, frankly, at the time they left the market, they had surpassed Netflix in terms of market They had a long time to develop distribution centers and whatnot. Netflix … I'm sorry, Walmart, even though it was a relatively new entrant, had a significant increase in its subscriber base at that point. It had more distribution centers for the relative time than Netflix had by comparison. But wasn't Walmart allowed to remain? The agreement did not provide. Well, they should exit the business, did it? The agreement did not say you could never come back in and sell DVD … rent DVDs. I agree with you on that. But, as Arita and Hovenkamp say, clearly the … the restraint consists in any written or formal documents, plus the way the parties have enlarged or interpreted the documents by their conduct. Well, I'll take you to the documents. You have the promotion agreement, which, by the way, Leslie Kilgore, the … one of the executives at Netflix, admitted that the language about Walmart independently deciding to exit the DVD rental market was not put in there by Walmart. It was put in there by Netflix, record at 909. You have the promotion … the press release, which accompanied the promotion agreement. And the press release says Walmart would discontinue its DVD rental business and in return, end quote, Netflix would promote Walmart's new DVD sales. You now go to internally. What did the parties think the deal was? This is after the second dinner with Hastings and Fleming. Leslie Kilgore, who is the chief executive … one of the chief executives at Netflix, writes to Mr. Hastings that it would be a, quote, mistake to do, quote, reciprocal advertising with Walmart unless it ends its DVD rental service. A couple of days later, Mr. Sussman at Walmart … by the way, that was in the record at 961. Mr. Sussman at Walmart says in the record at 1167, we just had a call with Leslie Kilgore, head of marketing at Netflix. Quote, her response was that because we have never shown a willingness to exit the business, Netflix would not be open to the idea of marketing their service on our side while our service still exists. She pressed us on the concept of exiting the business and asked for our subscription base. On March 9, record at 1034, Mr. Hastings writes in an email, agreeing with Kilgore that Walmart deal is, quote, not acceptable, end quote, unless Walmart exits the business. Mr. Sussman has an email on the 17th of March, record 1179, explaining that Netflix's plan to sell older and used DVDs shouldn't be a conflict with Walmart selling new DVDs. Why would you even say that unless it was an agreement not to sell new DVDs? Wouldn't make any sense. That same day, March 17, record 1128, there's an internal Netflix email to Hastings and Kilgore. The subject of the email is, quote, Walmart deal points. And it states, we are the rental business, they are the sell-through business. There's a Sussman email the next day summarizing conversations with Kilgore and Hastings as, quote, in a nutshell, Walmart is getting out of rental and we're going to be working together to build our businesses, movies sell-through for us, rental for Netflix. It clearly suggests, we submit, that there was a deal, not written out in the actual agreement or the press release, but internal documents clearly show that was the deal. What was the motivation for each of these parties to do the deal? Well, the Netflix motivation was clear. Mr. Hastings said it in that speech on April 21. If he gets a duopoly, his company makes a lot of money. Well, Walmart had motivation as well. Walmart's revenues from new DVD sales in 2005 was $4.7 billion. That actually was down 3% from the prior year. That was a very big market for Walmart. And it wanted that market. And it didn't want that market to diminish. At the dinner, the February 9 dinner, Mr. Hastings told Mr. Fleming that Netflix customers buy, on average, 2.5 DVDs per month, new DVDs per month. That is a very big enticement. And there were the commitments that I just read that I don't even think you have to read through the lines on. They're pretty clear. But furthermore, Mr. Hastings recognized that selling new DVDs would be easy if Netflix were also selling used DVDs. That's in the record at $4.48. Netflix planned to sell new DVDs as recently as November 2004, in the timeframe we're talking about. That's $4.47 and $4.48. That was before the market allocation agreement. Even though Netflix did begin selling used DVDs in June of 2005, right after the market allocation agreement, it didn't sell new DVDs. In other words, it was acting contrary to its economic self-interest. And at the press release in May, I think it was 18th of 2005, the chief financial officer of Netflix was asked by a reporter, does this agreement mean you can't sell new or used, you couldn't sell DVDs? His response was new or used. Didn't answer the question, except for the question we're dealing with here today. I would like to spend a few minutes, if I could. Well, you've got about a minute and 40 seconds. Okay. Well, I think I've covered why we think this is a classic market allocation case. The evidence we have is what I just went through. The district court accepted an invitation to talk about pro-competitiveness, pro-competitive virtues of the arrangement. That's nothing that should have been done. And if it should have been done on the continuum that Your Honor recognized in Safeway, it was so close to the continuum of per se that that's where it should have come out. I just wish to say that the court, frankly, out of the blue, said three agreements we relied on were not expressly pled as a basis for unlawful conduct in the operative complaint, and therefore we couldn't rely on them in opposing summary judgment. Rule 56C tells us we can rely on them. Rule 8A says we don't have to plead every piece of evidence that we find. And Federal Rule of Evidence 406, dealing with habit, says evidence of organization's routine practice may be admitted to prove that on a particular occasion an organization acted in accordance with its routine practice. Well, these three agreements, and we briefed them, deal with the same situation really with Amazon, Musicland, and Best Buy, saying you don't do rentals and we won't get into sales. Don't play in our sandbox. We won't play in yours. Thank you. Thank you. Mr. Kittles? Your Honor, I think we assume the response to the cost, the response to the antitrust argument would happen to bend the cost argument. All right. That's fine. Thank you, Your Honors. Jonathan Jacobson for Netflix. It's an honor to be here today. I want to talk about injury in fact. Injury in fact is a separate, essential, and distinct element of any antitrust cause of action. It's Hornbook law that it must be proven with reasonable certainty. It's the plaintiff's burden on summary judgment to raise a genuine issue of fact. What counsel says are not facts. What the record says are facts. And that's where I'd like to focus today. I want to start by pointing out that there is only one claim of injury in this case. Plaintiffs argued that if the promotion agreement had not been made, then sometime between January and May 2005, Netflix would have reduced the price of its three-out unlimited subscription plan from $17.99 to $15.99. They also argued it would have lowered the prices on all its other plans, and the prices would continue to be lower at all times on all plans through the end of the class period in September 2010. Now I'm going to call this the $15.99 theory. Plaintiffs never advanced any other claim of injury. The district court correctly understood that this was their only claim. Plaintiffs have never denied that this was their only claim. It's the only claim before the court today. The district court concluded that no reasonable juror could believe the $15.99 theory, and that was undeniably right for several reasons, and I'd like to list four. First, Netflix's major competitor was Blockbuster, not Walmart. Blockbuster had over 400,000 subscribers at that time. Remember, it had just started in September. It was growing rapidly. Walmart was less than one-eighth the size with 50,000, and it was losing subscribers constantly. On December 22, 2004, Blockbuster changed the world, that's the testimony and undisputed fact, by reducing the price of its three-out unlimited plan to $14.99 plus two free in-store rentals. And yet despite that, Netflix kept its price at $17.99. There was literally no evidence that if Walmart had stayed in the business, that would have affected Netflix's decision-making in the slightest. All the testimony, all of it, every document addressing Netflix's pricing during this entire time period is focused on Blockbuster, with some mention here and there about Amazon, which was still perceived as a threat at that point in time. Since Netflix didn't reduce price in response to the very aggressive onslaught from Blockbuster, there's no reason to believe that Walmart, with its shrinking presence, would have made any difference. And in fact, there is literally no evidence of it at all on the record that Walmart was a factor in Netflix's pricing considerations. It was never even mentioned, just as the district court found. Second, Netflix's three-out unlimited price, excuse me, Walmart's three-out unlimited price was $17.36, much higher than Blockbuster, and not much lower than Netflix's $17.99. Now, Walmart had a two-out unlimited plan that it reduced to $12.97, as counsel mentioned. That's mentioned once in the email that counsel referred to, but that email, which I encourage you to look at, has nothing to do with Netflix's own pricing. It's just here for your information is the fact that Walmart went to $12.97. At the time, Netflix had a two-out cap, not unlimited, but a cap plan at $11.99. That was the lowest price in the marketplace. There is no nary a mention of the $12.97 price in any of the many Netflix documents, and the pile is maybe this high, evaluating whether to reduce price in response to Blockbuster. The $12.97 price never comes up. And I'll give the Court just a few examples of this. In plaintiff's excerpts, $9.95, $9.97. In our excerpts, there's the whole presentation about what to do. It's at $11.18 through $25 of our excerpts. My third point, timing is important. Timing is very important in this case. This is a market that moves incredibly rapidly. After the October 2004 meeting, Hastings sent an email to Fleming to try to set up a meeting on January 25th, but they did not meet, and there was no substantive communication until February 9th, 2005. But the vigorous internal debate at Netflix that the district court referred to about whether to go to $15.99 to fend off Blockbuster ended after the first three weeks of January. Netflix confirmed then and stated publicly that it was staying at $17.99. That's at pages 53 and 66 of our supplemental excerpts and pages 231 through 32 of plaintiff's excerpts. The decision to stay at $17.99 was made before Netflix knew or had any clue that Walmart might exit, and that fact is not subject to any genuine dispute. My fourth point, as plaintiff's economists explicitly conceded, after Walmart's entry in June 2003, and I'm going to quote, there was no competitive response in terms of price change, plan change, quality change, or anything else that Netflix did that's attributable to any action taken by Walmart while it was in the online DVD rental space. That's our excerpts at page 507. Prior to Walmart's entry, Netflix was deathly scared about Walmart. Who wouldn't be? This is one of the biggest firms in American history. But after its entry, Walmart quickly proved a failure and was never even mentioned when pricing was discussed. The last time that Walmart is mentioned at the board of Netflix is in September 2003, a few months after it entered, and the board is advised that Netflix's entry has proven to be a failure. They're thought to have only 12,000 subscribers at the time. There's no word of mouth. They don't have enough inventory. They don't have enough distribution centers. And Walmart is never mentioned again at the board level. The documents that counsel referred to, and I'll take one example of them, he refers to his excerpts at 714. He says that the Walmart price reduction shows that they're to 1554, this is back in October, shows that Walmart is in it for the long haul. That's expressly described. It's a spreadsheet, so you have to actually go to the next page. You have to, which is page 715 of the plaintiff's excerpt, it's expressly described as a long shot, 2% to 25%. There's another document around the same time, also in October, that says that the risk of Walmart expanding is sized at 10%. This is not the stuff antitrust cases are made of, 10%, 2% probabilities. This is a case, Your Honors, in which virtually every waking thought of the leaders of Netflix is captured in e-mail. We produce 15,000, 15 million, excuse me, pages of documents, most of them e-mails. The fact that Netflix never mentioned Walmart ever in its pricing decisions after its entry underscores the correctness of the decision below. There's just no basis to believe that the presence of Walmart would have led Netflix to reduce prices between January and May 2005. Now, I do want to talk about one case and, of course, others to the extent the court has questions. But this court addressed the very same issue, truly, just last year in Somers against Apple. And, Judge Reinhart, you'll recall you were on the panel in that case. And that was a case where the plaintiffs alleged that Apple monopolized music downloads through the digital rights restrictions it had. As a result of those restrictions, you had to use an iPod and you had to use iTunes, and everyone else was locked down. And they alleged that this monopoly lasted from 2004 to 2008. And the claim was that without these restrictions, rivals would have competed more effectively, forcing Apple to lower its prices. And they pointed to Real Networks at the time, which later called its music operation Rhapsody. You may have heard of it. And Real Networks was charging $0.45 per download to the $0.99 that Apple was charging. So the argument was you lift the DRM restrictions, and goodness sake, Apple will have to compete hard against Real Networks. But just like this case, that injury theory did not square with reality. In 2008, Amazon, which keeps coming up in these cases, entered the market, removed DRM from its music downloads, forcing Apple to remove its digital rights restrictions as well. But Apple's prices did not go down. So the court concluded that the injury theory failed because if Apple didn't reduce prices in response to Amazon in the real world, there was no reason to believe it would reduce prices any earlier in plaintiff's but-for world, with or without the digital rights restrictions. And that's exactly the plaintiff's problem here. If Netflix didn't reduce prices in the real world to face the very real and very serious competition from Blockbuster, as to which there's a pile of documents expressing Netflix's concern, why would it reduce price in plaintiff's but-for world? And Somers was a 12B6 dismissal. The plaintiff in that case didn't even get discovery. So against the illogic of their argument, the admission by their economist that Walmart had no effect on anyone's pricing, and the fact that Walmart was never considered in Netflix's pricing decisions after Blockbuster's move to $14.99, what do plaintiffs have? Well, we heard it today. The best they have is the CNBC news clip from October 2004, a very different time period in a market where time moves rapidly. That's the earlier time when Netflix reduced price to $17.99. And counsel didn't mention this, but the record is overwhelming and really beyond dispute that that was in response to the threatened entry of Amazon, which was the concern at the time. And there were board minutes, internal presentations, extensive discussion about Netflix's concern about Amazon's entry. Now, the clip quotes Hastings as saying that Netflix made the price cut at the time to fend off, as counsel said, not just Amazon, but Blockbuster and Walmart as well. Plaintiffs cite that clip 11 separate times in their papers to suggest that it's really many different documents. It isn't. It's a simple news clipping. It's obviously inadmissible hearsay, and we objected to it in the court below on that basis. All the admissible evidence, the internal presentations, the emails, the board minutes, focuses only on Amazon. Walmart is not mentioned. But what if the news clip were admissible? It would still have no probative value. Giving the plaintiffs the benefit of every conceivable doubt, the district court still found that it was Blockbuster's decision to go to $14.99 on December 22, 2004, and not anything Walmart did that led to Netflix's consideration of a price reduction in early 2005. The Blockbuster price cut is the one which everyone agrees changed the world. Plaintiffs offer no connection between Netflix's thought process in cutting prices in October 2004 and this later separate event. When Netflix decided in January 2005 not to reduce price further, Walmart was never given a thought. Now, plaintiffs also said they put forward expert testimony, and that's enough. Case after case after case after case says otherwise. The expert testimony has to be reasonable. Footnote 4 of Judge Reinhart's opinion in California against Safeway says that. Brook Group in the Supreme Court says that. Rebel Oil from this Court says that. There are a dozen other cases, and we cite several in the briefs to the same effect. Expert testimony doesn't create an issue of fact unless, as Judge Reinhart put it in his questions, the facts are there supporting the opinion. And here, there's nothing. Now, what do you do? I haven't come to the promotion agreement yet. I'm sorry, Your Honor? I said you haven't come to the promotion agreement yet. I'm focusing on the lack of injury, Your Honor. I'm happy to talk about the promotion agreement. All right. Well, no, no, finish off with your lack of injury, because that's important. Thank you. Are you going to discuss the promotion agreement later? I'm happy to respond to questions. I do have a prepared presentation on it. I'm happy to respond. Well, no, it's never a good idea to give a prepared presentation. No, no, finish up with your ---- Well, I've actually tried to be prepared for most of my appellate arguments and disappointed. But just don't read it. You're right. Wait for the questions. But, no, we are interested in the injury arguments. I'll get to the promotion agreement. I just want to close up the injury point by talking about the concept of three-firm competition. And plaintiffs cite the earnings presentation at their excerpts, 405 through 418, in which Mr. Hastings talks about the profitability if there are two significant firms. And he uses the word significant or major firms. And he uses it repeatedly. But he also makes entirely clear in that presentation, in fact, in the same passage that plaintiffs cite, that Walmart is not a significant or major competitor. He explains that Blockbuster is a formidable competitor. That's the quote used in the paper there. He explains that Blockbuster has demonstrated that the cost of entering effectively into online DVD rental is high, that Blockbuster has surmounted it. And he concludes that it's unlikely, given where Blockbuster is, that others are going to hurdle that as well. And he believes that going forward it will be a two-firm market. He specifically mentions Walmart and specifically concludes that Walmart is not a major competitor. The only major competitors are Blockbuster and Netflix. And that's, of course, consistent with the reality in the marketplace at the time. Walmart had a 1.5 share and declining. Walmart kept this confidential because it didn't want all of its subscribers to cancel. It wanted to have something to sell. But Walmart made a decision to shut down the DVD-R business in a meeting that was held on January 3, 2005, confirmed on January 14, 2005, when the CFO of Walmart Online met with the CEO of Walmart Online, Mr. Fleming, met with the CFO, Mr. Nave, and they decided to take a reserve for closing the operation. And the reserve was, in fact, taken. There's a journal entry, February 4, 2005, retroactive to Walmart's fiscal year, which is January 1. February 4, again, is five days. Is that a contingent action that that would be available if they decided to close, or is there evidence that shows that it was set as the reserve was adopted because they had decided to close? If you go to the journal entry itself and you go to the meeting that preceded it, which is at our excerpts, 1190, you see that the decision was, in fact, made. Now, counsel has made the point in their papers and below that it could have been reduced by the higher-ups. But the decision was made. There was no basis for the higher-ups to reverse it, and they never considered doing so. And you don't take a reserve to close a business unless your intention is to close the business. It's just simply not done that way. Now, I see my yellow light is on. So unless there are further questions on injury, I will talk about the promotion agreement. The promotion agreement is fundamentally an acquisition by Netflix of Walmart's subscriber base. There are options for Walmart to continue to promote Netflix DVD rentals. Netflix would pay Walmart $36 per sub for anyone who signed up from Walmart's website. But there was nothing in the agreement, nothing in the understanding, nothing in the handshake, nod, or wink to suggest that Walmart agreed in any shape or form that it wouldn't get into the business. It had no interest in doing it. It had already tried and failed. But there was no agreement whatsoever, no evidence, no hint that Walmart could not get back in. Netflix also had an option to promote online DVD sales by Walmart, and the evidence is that they did so but on a limited basis. But in either case, both firms had options to promote the other. There was no obligation from either side that they do so. There were no covenants not to compete. There was nothing forcing Walmart to stay out of DVD. In fact, a few years later it acquired a company called Vudu as now a streaming competitor of Netflix's. And the concept that what's fundamentally an acquisition is illegal per se I think defies all precedence. The counsel referred to your opinion in the Safeway case, Judge Reinhart, and I read that actually several times before argument today, and you're applying a variation of the quick-look approach. One can search plaintiff's briefs upside down, sideways with a microscope. That argument is not advanced in this case. They argue in their main brief per se. They don't even address rule of reason. They address rule of reason in their reply brief. The concept of a quick look or the sort of sliding scale approach of Judge Souter in the California dental case, never referred to, never mentioned in their brief. It's not an issue before this court on appeal. Now, we explain in the brief at some length why there is truly no evidence at all that Netflix agreed or even discussed with Walmart whether it would sell new DVDs or not. Absolutely nothing in the record at all. Counsel misspoke, and he didn't give a record reference for this, so I don't have a chance to go back and look at it, but he referred to some Sussman document or testimony about a Netflix plan to sell new or used DVDs. There's no such evidence in the record. Sussman testified, as did everyone else, that the subject was never discussed between Netflix and Walmart, and there's no document to suggest otherwise. Counsel also says, well, Netflix had a plan, and he cites his record excerpts at 447 to 48, that Netflix had a plan in November of 2004 to sell new DVDs. Completely inaccurate, Your Honors. If you go to anywhere in the record, you can look at plaintiff's excerpts at 1027 is one example. You can see that the senior leaders at Netflix got these suggestions from the staff who were always looking, you know, how can I earn more money, and the subject of selling new DVDs always came up, and the senior people at Netflix said, no, the reason we're successful is the decision we made back in 1999 not to do that. Leslie Kilgore, who you heard Counsel refer to, said that. Can you time us up if you want to wind up with a sentence? The sentence was Leslie Kilgore testified that she never would have come to Netflix if Netflix was in the business of selling new DVDs. Thank you, Counsel. Thank you, Your Honors. I'll be very short. Your Honor asked about the promotion agreement. The promotion agreement was pretextual. You get that out of Reed Hastings' own mouth. He said, quote, at 1042, we don't promote them except we do a one-time something nice for them at launch. The January decision was asked about. The January decision was retroactive, as Your Honor mentioned, but I want to point out that an oral argument below, Netflix conceded the date of Walmart's decision to exit the market as a question of fact, the FER 4924 at lines 13 and 14. Your Honor, Counsel talked about the price versus Walmart. The time frame is really pretty short. You got 2003 when we got in the market and we're lurking in terms of Walmart looking, I mean Netflix looking at us. October 2004, it's the up against the wall. January of 2005, they're concerned about the 1297 two-out price. So they take Walmart into account. And, frankly, there'd be no reason. But when Walmart got into the market and it seems Netflix increased their price. I'm sorry. I didn't hear you. Did Walmart get into the market in June 2003? Yes. And then Netflix increased their price and it only went down when Blockbuster got in the market. When it's a three-fer market, that's exactly what happened. And, indeed, when it became a two-firm market right after Walmart left in May, Mr. Hastings says, it's in my notes, but because Blockbuster increased its price $3 a month from $14.99 to the Netflix price of $17.99, and Mr. Reed Hastings says, as planned, he recognized what would happen. I wish I could find the, oh, here it is. He said, a pretty picture, Blockbuster at $18 as planned, record $10.73. He also said, now if we just run Blockbuster out of town, we'll get it all, record at $10.76. Your Honor, no comment was made about the deprivation of competition in a DBD rental market. As this Court has said in Glenn Holly, explaining that exit of a competitor in a concentrated market demonstrated injury because, quote, customers are the intended beneficiaries of competition, end quote. End quote. Customers are presumptively those injured by its unlawful elimination. And experts. Well, the Court asked about experts. There were doubler challenges to our experts. The Court denied those challenges. The Court said, your experts can testify before the jury. Experts in and of themselves create injury, in fact, under many opinions of this Court. Southland Saul, Dauphin Torres, William Inglis, Catalano. And I'll end by saying counsel said our best evidence, I agree it's pretty good, I don't know if it's our best evidence, is the statement by Mr. Hastings, the CNBC interview. That constitutes an admission. And it is powerful. We think the district court was wrong. We ask for this Court to reverse it. We also ask this Court to focus on the per se nature of this case should it send it back. Thank you very much. Thank you, counsel. Thank you. Now we're on to the costs. All right. Counsel. Thank you, Your Honor. Gil Katelpas for appellants on the cost issue. For the record, if you reverse the summary judgment ruling, you do not have to decide the cost issue. So I mean no disrespect to Mr. Abrams standing up here. I agree with him. But I'm going to argue the cost issue anyway. The Court should vacate the district court's taxation of $317,000 of costs for collecting, analyzing, searching, and managing electronic documents because they are not costs of copying under 28 U.S.C. 1920. The Court should separately vacate and remand the award of $250,000 in disputed costs with instructions to the Court to narrowly apply the terms of the cost statute and to make factual findings sufficient to show how the Court exercised its discretion. Plaintiffs agree that the reasonable costs of making copies of electronic documents are recoverable. And we have not challenged approximately $147,000 in costs taxed by the district court. But the district court committed legal error by broadly construing Section 1920. And those are not my words. Those are the Court's words. I am broadly construing Section 1920 for electronic discovery. And the phrase making copies of any materials necessarily obtained for use in the case to cover costs to collect, analyze, and search documents. These are not costs of making copies. They weren't costs of making copies in a paper world, and they're not costs of making copies in an electronic world. Just one example. The cost to analyze and review hundreds of boxes of paper documents for the words and phrases that separate the paper documents that are likely relevant from the paper documents that are likely not are not recoverable. Nor are the costs of the more efficient process of searching hundreds of gigabytes of documents for the words and phrases that will make some of those documents likely relevant and some of those documents likely not. Yet here, the Court taxed more than $100,000 for these keyword search activities. They're not costs of making copies. We cover the whole range of these costs at pages 7 through 9 of our brief that get to the $317,000. Now, why did the district court tax these costs? Well, it did it in reliance on this circuit's Taniguchi decision. The district court wasn't adapting that out of whole cloth. It was relying on our now reverse decision in Taniguchi. So where did that leave us? Well, that's where I was going next. And the point is, the Court was impressed by the Third Circuit's, I think, rationale in race tires, but it said, I really can't follow race tires because in this circuit, Taniguchi tells us to have a broad interpretation of cost. The Supreme Court has rejected that notion and said that while there is a broad presumption in favor of awarding costs to a winning party, there is no presumption of statutory construction in favor of the broadest possible reading of those costs, and we look at the plain language of the words, costs of making copies. Two other circuits have now looked at this, the Third Circuit in race tires and the Fourth Circuit in Country Vintner, and we supplied Country Vintner in a 28J letter. And both of these courts slogged through the definitions, slogged through the history of 1920, and looked at and compared the paper world and the electronic world, and they came to the same conclusion. The cost of making copies is the cost of converting something to its production format and putting it on production media. The differences in those cases were dramatic. What was in race tires, a $365,000 request turned to $20,000 in recoverable costs. In Country Vintner, $111,000 that were requested became $218 in recovery costs. Remember, the taxation statute is not a cost-shifting statute. It really is an anti-cost-shifting statute. It was adopted to deal with multiple state laws and the federal courts applying to local state laws and get to this point where we are not cost-shifting the cost of litigation, the cost of discovery in general. We're focused on narrow provisions. The Court should follow the Third and Fourth Circuits here. To do otherwise would be a chilling effect on plaintiffs who are trying to defend their rights and move literally hundreds of thousands of dollars of costs to those plaintiffs if they lose. Second, I want to focus on the disputed costs, which also are an interesting issue. The district court abused its discretion by taxing an additional $245,000 in costs without explaining how it resolves significant disputes about the type, necessity, and reasonableness of those costs. Factual findings are the road map for you to decide if the court abused its discretion. And I'd say they're even more important here, given that the Court announced it was following a very broad view of what costs were recoverable under Taniguchi. And so we don't know, because the Court didn't tell us, how that affected the decisions it made on the remaining costs. The Court should vacate and remand this award. It's not simply enough for the Court to say, as it did here, that I read the briefs and I'm now making this decision. Netflix tries to help the Court out by saying it also said for the reasons stated in the transcript. Well, I've read the transcript and there are no reasons stated for the transcript. In fact, the Court doesn't announce its decision in the transcript and hardly could be seen to announce the reasons. I also want to just point out very quickly, there is an interesting contrast. The plaintiffs here, I'm sorry, the Netflix here, challenges a $21,000 cost, which is well explained by the Court. The Court explains why it disallowed that cost, because it viewed it as duplicative. It viewed it as unnecessary. And you can go back to the transcript and see the discussion of that. That's a huge contrast to $250,000 in costs that are unexplained. I'm going to reserve the last few seconds I've got. Roberts. Good morning, Your Honors. May it please the Court, Dillon Liddyard for Netflix on the cost appeal issue. I think as both sides can agree, this issue on the cost is under 28 U.S.C. 2019-20 subpart 4, and it's really separated into two different buckets. So I'd like to talk about the buckets of costs that we're talking about in this particular appeal. The first bucket is mainly the costs, a big chunk of them, are the costs associated with tiffing documents for production in the case. The plaintiffs concede that those costs are, in fact, taxable, and the standard to apply here is abuse of discretion. Whether the district court abused its discretion in awarding these costs in the amount of approximately $200-something-thousand, the answer is clearly no. The district court carefully considered the arguments of counsel, the submissions, the declarations that were submitted by both experts in the case and decided that the costs that Netflix was seeking, and mostly the tiffing costs between 6 and 7 cents per page, was a reasonable cost to impose and awarded Netflix a cost. That's all that's required of the district court to do in awarding costs in that amount, and I'd refer the court to Save Our Valley as one of the cases that we cited. It's a Ninth Circuit decision back in 2003. So we'd respectfully request the court to affirm the district court's awarding of costs for tiffing because it did not abuse its discretion. I would like to turn to the second bucket, where it's the cost of producing electronic discovery, and I think it's important to note in this particular case the plaintiffs repeatedly demanded that Netflix produce documents in a specific format. They requested tiff images. They requested searchable text files. They requested metadata. And in order to comply with those onerous, frankly onerous demands, Netflix ended up producing over 15 million pages of documents in this case. It's very lopsided. The demands never ceased, and Netflix simply complied. Why do demands have anything to do with the cost statute as it's currently structured? I mean, it may well be that our cost statute needs to be revised in light of the reality of electronic discovery and the demands of electronic discovery now, but what's wrong with Judge Vineski's formulation in Race Car that, look, the analog in copying is that we pay for copying, not for the time associated with it? Well, I think Race Tire has it wrong. And if you step back in time and we go back to the olden days where it was paper copies. Right. And the Race Tire Court alludes to paper copies and, frankly, I think gets it wrong. In the world of paper copying, the $0.10 per page or the $0.15 per page, which everyone agrees is a reasonable cost to charge per page of copy, what goes into that cost? It's not just the paper. It's a delivery person that you send to the client's site or to your office to pick up boxes of documents for copying. It's the fuel that it takes to drive that vehicle to some location where there's a copy machine. You're paying man hours for a person to manually stand at the copy machine and make copies. You're paying for the ink, overhead, electricity, wear and tear on the machine. That is all baked into that $0.10 to $0.15 per page. And so what we've now in the electronic world, when plaintiffs make a discovery demand, we want you to produce ESI in a particular format and we want load files and we want metadata. The processing of all of that is all wrapped up into a cost. But it's no different than the paper copying. It's all part of now in the electronic world in terms of you have to make copies upon copy upon copy in order to get the materials under the statute in a form that's demanded by the plaintiffs. I've never heard of paper, the cost of paper, including fuel costs. You may presume that, but I've never seen that. Well, for example, if you run into a Kinko's and you pay $0.10 to $0.15. There's a pricing mechanism. I agree with you. You know, it's just an interesting issue. I'm not sure that we're going to have to carefully consider that because the Supreme Court in Taniguchi basically said you're taking too broad an approach in your circuit. And although it's a different subsection, you have to look at that guidance pretty carefully. Right. What I think in Taniguchi the court was looking at subsection 6 on interpreters versus translators. Here the subsection 4 was amended in 2008 to replace the words paper copies with any materials. And so when the court is looking at copies of materials, clearly load files, metadata, text files or materials under the statute under the ordinary meaning are not clearly recoverable. So with that, that's all I have unless there's any further questions. Thank you, counsel. Thank you. Thank you, Your Honors. Two quick points. First on the standard of review on the $250,000 issue of the disputed costs. I just want to point you to page 10 of Netflix's opening brief where they state what the standard of review is in Cite Hinkson. And they say you must affirm a district court's factual finding unless the finding is illogical, implausible or without support in inferences. Here there is no factual finding. They ask you to resolve disputes. We don't know how or why the court resolved those disputes. Second, on this question of the demand. We demand what the rules say we can have, right, which is Rule 34 says you ask for the documents either as they're kept in the ordinary course or a reasonably usable format. It's made to sound very unusual, but the format we requested is the classic reasonably usable format. And they have the option to say, no, we'd like to choose another reasonably usable format or we'd just like to give them to you in native. In any event, we pay for costs of copying. We don't pay for all these extra costs. They're significant. Litigation is a significant cost, but the statute does not provide for recovery of those costs. Thank you. Thank you, counsel. The case gets argued. It will be submitted.
judges: George, Reinhardt, Thomas